The two above-captioned matters arise as applications to vacate or modify arbitration awards. In both docket number CV02-0818282S and docket number CV01-0810463S, a grievance arbitration proceeding was held before a three member panel of the state board of mediation and arbitration between the city of Hartford (plaintiff or city) and Local Union No. 760, International Association of Firefighters (defendant or union). A majority of each panel issued an award favoring the defendant, and the plaintiff has applied to the Superior Court to vacate or modify the respective awards pursuant to General Statutes § 52-418. The union has applied to the Superior Court to confirm the awards.
The following facts were undisputed by the arbitration panels. The collective bargaining agreement (contract) in effect at the time of the grievance between the plaintiff city and the defendant union has, since July 1, 1978, contained a clause entitled "College Incentive *Page 40 
Pay."[1] In docket number CV02-0810463S, the grievant submitted copies of transcripts from Western States University (Western) to the fire chief and the personnel department and, on the basis of those transcripts, requested payment of a 5 percent college incentive payment as permitted under article 3, § 3.15, of the contract. The personnel department subsequently informed the grievant that the incentive payment was denied on the ground that Western was not accredited[2] in accordance with article 3, § 3.15, of the contract.
In docket number CV02-0818282S, each grievant submitted a diploma from Western as the basis for receiving college incentive pay. Both of the grievants were granted college incentive pay. This payment, however, was stopped upon discovery that Western is not an accredited university. At the hearing, the city stated for the record that for twenty years prior to 1998, credits were accepted from Western to fulfill the requirements of the college incentive program. A new collective bargaining agreement was reached in June, 2000, between *Page 41 
the city and the union providing that only colleges and universities accredited by regional accrediting associations would qualify for college incentive pay.
The union claimed that the grievants were entitled to an increase in pay based on the college incentive pay program since the continuous practice of the parties for over twenty years in interpreting article 3, § 3.15, of the contract was to provide college incentive pay for graduates of Western. The city based its denial on the contention that Western is not an accredited institution under the terms of § 3.15 of the contract because its accreditation was not by a "recognized" accreditation agency.
The records[3] in each grievance further show that the issue of accreditation began in 1998 when it was brought to the attention of Elizabeth Dunn, personnel administrator for the city of Hartford, that a firefighter received his bachelor's degree from Western and, two months later, received his master's degree from Western as well. Dunn was confused by the transcripts, since the graduate worked full-time as a firefighter during the two months between his two degrees. Dunn decided to investigate by conducting research into the accreditation process and Western.
According to Dunn's research, there are three levels to the accrediting process. The first level is the immediate accreditor, which, in the present case, is the Accrediting Commission International for Schools, Colleges and Theological Seminaries (commission). The second level is an institution that recognizes the accreditor as a bona fide accreditor. The final level is the agency, most often a governmental agency, i.e., the United States Department of Education (department), that approves *Page 42 
the recognizer. Dunn discovered that Western is neither accredited by any of the six regional accrediting agencies, nor by any agency recognized by the department.
Western claimed to be accredited by the commission. According to the department, the commission is not a nationally recognized accrediting agency. In other words, the United States Secretary of Education has not determined that the commission is a "reliable authority as to the quality of education or training provided by the institutions it accredits."[4]
The office of higher education for the state of Missouri also wrote to Dunn on November 6, 1998 stating that a prior accrediting group for Western called the International Association of Schools, Colleges and Theological Seminaries, had been enjoined by the Missouri attorney general in 1989 for selling accreditation. The commission had then taken over as accreditor but again, was "unrecognized" in Missouri.[5] The department of higher education for the state of Arkansas informed Dunn that the commission, located in Beebe, Arkansas, was not a recognized accreditor for those institutions located in Arkansas. The commission's Internet website states that the average cost of accreditation is $2000, including a necessary one time "on-site" visit. In response to a rhetorical question of whether "the benefits of membership justify the cost," the commission replies: "Yes. Absolutely! One of the first questions a prospective student asks a college or school is, `Are [you] Accredited?'. . . . Schools use our name as a referral. . . . Hundreds of students are gained by our *Page 43 
membership each year based on the fact that the school is accredited."
Western does not require "students" to attend classes, complete course work or take examinations. Western awards degrees based on life experience and requires a payment based on the degree sought; i.e. $1900 for a bachelor's degree and $2400 for a master's degree.[6] In its student catalog, Western states: "We are not a teaching or instructional university at the present time."
Western's student catalog, which is part of the record in the present case, answers: "[h]ow it is done." The student assembles a portfolio of experiences, courses and learning activities. The student is urged to include everything, no matter how small, for the review of Western. The "registrar" at Western then "matches" this material to regular courses at traditional universities. A "pass" grade is then awarded to the student for each matching course.
The transcript in docket number CV02-0810463S indicates the grievant received a bachelor's degree in business administration from Western on September 2, 1998. It shows that the grievant was given twelve credits ("Grade: pass; attempted 12, earned 12.") for English courses, taken at Connecticut colleges, a list that he had placed in his portfolio. He also received like credit for other academic, real estate and business courses *Page 44 
previously taken. For letters written about his various civic and union activities, the grievant received a "pass" and four credits for a course entitled "Creative Leadership."
Despite the fact that Western has no recognized accreditation, the city had been granting college incentive pay based on credits received through Western.[7] At the time of the grievances, fifteen firefighters were receiving college incentive pay based on Western credits.
In both cases the arbitration panels concluded that based on past practice and custom over the course of the past twenty years, the grievants were entitled to their college incentive pay. The majority found that the prior conduct of accepting credits from Western over the past twenty years created an obligation outside of § 3.15 of the contract to continue to accept credits from Western for college incentive pay. In essence, the past conduct of the city established an understanding that Western fit the requirements of accreditation under § 3.15 of the contract. The city argues that it was under the mistaken belief that Western was accredited, and changed its policy accordingly, when it was discovered that Western was not accredited.
Long-standing principles of arbitration law favor the union on the first issue raised by the city in its application to vacate. The city claims that § 52-418 was violated in that the arbitrators' award did not conform to its submission. In docket number CV02-0818282S, as previously indicated, the college incentive pay was halted after being initially allowed. The submission to the arbitration panel was as follows: "Did the City violate its *Page 45 
Collective Bargaining Agreement with Local 760 when it denied the grievants college incentive pay? If so, what shall the remedy be?" The award was as follows: "The grievances are sustained. Each grievant shall be made whole for all losses sustained as a result of the City's elimination of the college incentive payment."
The city's argument fails because "`[w]hen the parties agree to arbitration and establish the authority of the arbitrator through the terms of their submission, the extent of [the court's] judicial review of the award is delineated by the scope of the parties' agreement. . . . When the scope of the submission is unrestricted, the resulting award is not subject to de novo review even for errors of law so long as the award conforms to the submission.'" Middlebury v. Teamsters Local Union No.677, 57 Conn. App. 223, 226, 748 A.2d 340 (2000), quoting Garrity v.McCaskey, 223 Conn. 1, 4, 612 A.2d 742 (1992). As to this docket, then, the city has failed to show that the submission was restricted; see U.S.Fidelity Guaranty Co. v. Hutchinson, 244 Conn. 513, 516, 710 A.2d 1343
(1998); or that the award does not conform to the submission.
In docket number CV02-0810463S, in which the college incentive pay was never allowed, the question posed to the arbitration panel was as follows: "Did [the city] violate its Collective Bargaining Agreement (Article 3, Section 3.15) with Local 760 when it denied the grievant college incentive pay? If so, what shall the remedy be?" The award was as follows: "The [city] violated its Collective Bargaining agreement (Article 3, Section 3.15) with local 760 when it denied the grievant college incentive pay." This submission was also unrestricted. See State
v. AFSCME, AFL-CIO, Council 4, Local 2663, 257 Conn. 80, 86, 777 A.2d 169
(2001).
The city argues that the arbitrators exceeded the submission in making use of the past practice of granting the college incentive pay to interpret the term *Page 46 
"accredited" in § 3.15 of the contract. A similar case that considered this issue is Duxbury v. Duxbury Permanent Firefighters Assn., Local2167, 50 Mass. App. 461, 737 N.E.2d 1271 (2000). In Duxbury, the plaintiff denied that a firefighter could earn vacation or sick time while on injured on duty (IOD) leave. At a resulting arbitration, the arbitrator held that there was a "clear past practice of crediting similarly situated individuals on IOD leave with vacation and sick time." Id., 464. The appeals court "deferred" to this interpretation by the arbitrator, even though the plaintiff argued that there was no ambiguity in the contract. The parties had bargained for the arbitrator's interpretation, and they got what they bargained for. Id., 465.
The court, therefore, rejects the first contention raised by the city.International Brotherhood of Police Officers v. Windsor,40 Conn. Sup. 145, 483 A.2d 626 (1984): "Normally, the court examines the award in light of the submission and if it finds conformity, the award stands. . . . If that were the sole standard, the award in this case should be confirmed." (Citation omitted.) Id., 147.
The second issue raised by the city — that the award violates public policy[8] — is more troubling. It was not fully considered by the arbitration panel in either grievance.[9] Our Supreme Court has held that "the judicial *Page 47 
review of whether an arbitral award implicates and violates public policy is necessarily de novo review. . . . `Where there is no clearly established public policy against which to measure the propriety of the arbitrator's award, there is no public policy ground for vacatur. If, on the other hand, it has been determined that an arbitral award does implicate a clearly established public policy, the ultimate question remains as to whether the award itself comports with that policy. . . . [W]here a party challenges a consensual arbitral award on the ground that it violates public policy, and where that challenge has a legitimate, colorable basis, de novo review of the award is appropriate in order to determine whether the award does in fact violate public policy.' (Citation omitted.) State v. AFSCME, Council 4, Local 387, AFL-CIO,252 Conn. 467, 475-76, 747 A.2d 480 (2000), quoting Schoonmaker v.Cummings Lockwood of Connecticut, P.C., 252 Conn. 416, 429,747 A.2d 1017 (2000). This law is based on the leading United States Supreme Court case of W. R. Grace Co. v. Local Union 759,International Union of United Rubber, Cork, Linoleum Plastic Workersof America, 461 U.S. 757, 103 S. Ct. 2177, 76 L. Ed. 2d 298 (1983): "If the contract as interpreted by [the arbitrator] violates some explicit public policy, we are obliged to refrain from enforcing it. . . . Such a public policy, however, must be well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." (Citation omitted; internal quotation marks omitted.) Id., 766.
Thus, the court must first determine whether such a public policy can be identified in the present application to vacate the award and then decide if the arbitrators' award violated this policy. State v. AFSCME,Council 4, Local 387, AFL-CIO, supra, 252 Conn. 476. In this analysis, "the court is not concerned with the correctness of the arbitrator's decision but with the lawfulness of enforcing the award." (Internal quotation marks *Page 48 
omitted.) South Windsor v. South Windsor Police Union Local 1480, Council15, 255 Conn. 800, 815, 770 A.2d 14 (2001). "A challenge that an award is in contravention of public policy is premised on the fact that the parties cannot expect an arbitration award approving conduct which is illegal or contrary to public policy to receive judicial endorsement any more than parties can expect a court to enforce such a contract between them." Id.
According to the aforestated precedent, the court first addresses whether a public policy has been identified in the city's application to vacate the arbitration award. The applicable public policy must be "explicit," not merely drawn from considerations of "supposed public interest." Groton v. United Steelworkers of America, 254 Conn. 35, 46,757 A.2d 501 (2000). In South Windsor, the Supreme Court ruled that an arbitration award should not have been vacated where a police officer had misused his weapon in an arrest and was restored to service by an arbitration panel. The town's valid public policy of requiring a police officer to be fit for duty had been satisfied under the facts as found by the arbitrators. In addition, the town's claimed goal of providing its citizenry with a competent police force was just a "general consideration" and could not be called a "public policy." South Windsor
v. South Windsor Police Union Local 1480, Council 15, supra, 255 Conn. 824: see also Ohio Council 8, AFSCME, AFLCIO v. Trumbull Memorial Hospital,124 F. Sup. 2d 482, 486 (N.D. Ohio 2000) (public policy recognizing surgeon's judgment in supplying appropriate patient care was amorphous, not "explicit and specific").
On the other hand, in State v. AFSCME, Council 4, Local 387, AFL-CIO, supra 252 Conn. 476-77, our Supreme Court held that public policy required the vacation of an arbitration award reinstating a correction officer instead of terminating his employment for making a profane and racist telephone call to a state senator. *Page 49 
There was an "`explicit, well-defined and dominant'"; id., 472; public policy against anonymous racist telephone calls made from a state owned telephone by a state employee while on duty given that there was also a state statute prohibiting harassing telephone calls.
The city claims that the award in the present case violates the established public policy of disallowing fraudulent or false claims from being presented by employees to the city for payment. There is clearly a public policy against public employees abusing their position. See Dept.of Auditor General v. Council 13, AFSCME, 136 Pa. Commw. 87, 90,582 A.2d 98 (1990) (office selling scheme by public employees), appeal denied, 527 Pa. 654, 593 A.2d 425 (1991). There is a further public policy of honesty by a public officer in submitting official documents.International Brotherhood of Police Officers v. Windsor, supra,40 Conn. Sup. 148; see also Stamford v. Stamford Police Assn.,14 Conn. App. 257, 260, 540 A.2d 400 (1988), approving of public policy of honesty as identified in International Brotherhood of PoliceOfficers.
 Duxbury v. Duxbury Permanent Firefighters Assn., Local 2167, supra,50 Mass. App. 461, discusses town employees filing for sick leave credit while on injury leave and finds "a well-defined and dominant public policy against `windfall' payments to individuals, as a result of erroneous actions by municipal officials in making the payments in the first instances. . . . The policy arises from a need to protect the public treasury from unwarranted money payments."[10] (Citations omitted). Id., 465. *Page 50 
Also closely related to submitting a less than honest report to a municipality is the situation in which a teacher seeks a position without possessing the proper academic credentials. See Meehan v. Nassau CommunityCollege, 243 App. Div. 2d 12, 676 N.Y.S.2d 178, (public policy of not permitting employees to teach history courses when not accredited in that subject matter), appeal denied, 92 N.Y.2d 814, 704 N.E.2d 228,681 N.Y.S.2d 475 (1998).
The public policy of allowing a public employee to obtain only those benefits to which he or she is honestly entitled has been established by the state legislature in its enactment of General Statutes § 53a-119. Subsection six of § 53a-119 declares that "[a] person is guilty of defrauding a public community who . . . (C) as an officer . . . of any public community, with intent to prejudice it . . . presents . . . any fraudulent claim against such community. . . ." General Statutes § 53a-119
(6) (C). This statute, which was enacted almost in this same form in 1874, was from the first directed against employees who further fraudulent claims while "acting for the public weal; assisting the town in the discharge of its public duty." State v. Clerkin, 58 Conn. 98, 102,19 A. 517 (1889).
A more recent opinion by our Appellate Court declares: "This state's compelling public policy of not tolerating the knowing misappropriation of state funds by state officials or employees cannot be disputed. General Statutes § 53a-119 (6), which explicitly proscribes such conduct, represents an unequivocal legislative articulation of this policy. The public policy of discouraging fraud generally is firmly rooted in our common law as well." State v. Council 4, AFSCME,27 Conn. App. 635, 641, 608 A.2d 718 (1992). In Kutas v. State,135 Misc. 2d 1044, 517 N.Y.S.2d 857 (1987), aff'd, 146 App. Div. 2d 542,537 N.Y.S.2d 30, vacated as moot, 148 App. Div. 2d 306, 538 N.Y.S.2d 983
(1989), an employee *Page 51 
of the state motor vehicle department misstated his age to become eligible for employment, claiming to be fifty-seven when he was, in fact, seventy-one years of age. When he retired ten years later, his application for a pension was rejected. The court approved of this denial in part as follows: "Public employment is involved in this case and considerations of public policy would seem to add to the impropriety of paying benefits in the face of admitted fraud of the System." Id., 1050. In addition, numerous professionals have been disciplined for misrepresenting their academic credentials to prospective employers. SeeIn re Hadzi-Antich, 497 A.2d 1062, 1064 (D.C. App. 1985), in which an attorney's wife erroneously prepared a list of his law school honors that was submitted to his employer.[11] Based on the foregoing, the court concludes that there is an explicit public policy against public employees submitting wholly unsubstantiated claims of educational achievement to their employer municipality to obtain a benefit or an advantage.
The court now "proceed[s] to the second prong of the analysis: whether the arbitrator[s'] award violated this clear public policy." State v.AFSCME, Council 4, Local 387, AFL-CIO, supra, 252 Conn. 477. The arbitrators in each grievance approved the granting of the college incentive pay allowed under the collective bargaining agreement. The records before the court show that the grievants received their degrees from an institution that was not "a teaching or instructional university," according to its own student handbook. It merely *Page 52 
took the grievants' list of life's experiences and created a transcript for each "student." In addition, Western has never been accredited by a recognized accreditor, only by one institution that was closed by the Missouri attorney general and another unrecognized either in Missouri or Arkansas.
The "resume review" degree program of Western may be contrasted with Connecticut's Charter Oak College (Charter Oak), established by the state board for academic awards under General Statutes § 10a-143. Charter Oak allows for "portfolio assessment." Information published by Charter Oak shows that the school accepts experiences that show prior learning, even if not in an academic setting, but the school will not award credits for experience alone or for internships or field schools. After consulting an academic counselor, the student constructs a narrative of experiences to support a claim of knowledge in a subject matter. The portfolio is "independently reviewed by two higher education faculty who are experts in the area they are reviewing. Faculty reviewers give written comments on the strengths and weaknesses of [a student's] portfolio." Specifically in contrast with Western, "[r]eviewers may award credits requested, deny credits, or ask . . . for clarification. This provides for a collaborative process, with opportunity for faculty to request further information in cases where they suspect that [the students] have knowledge but . . . have not described it sufficiently. In the event that faculty disagree in their assessments, [the] portfolio will be submitted to a third faculty evaluator whose decision is final."
Moreover, the court is not merely engaging in a quibble over the meaning of the word "accredited." For example, in Goddard v. South BayUnion High School District, 79 Cal. App. 3d 98, 101,144 Cal. Rptr. 701 (1978), a history teacher was denied an "advancement on the salary schedule" because the school district *Page 53 
refused to accept courses he had taken at Southwestern University School of Law, a school not accredited by the standard regional accreditor. The law school was, however, approved by both the American Bar Association and the California State Committee of Bar Examiners. Id., 108. The court concluded that while the school district could properly restrict salary credits, the teacher had met the requirement of receiving credits from an "accredited" institution as properly defined. Id., 110. The school district had been too narrow in its interpretation of the term "accredited." Here, by contrast, the grievants tendered their transcripts from a school that taught nothing, that did nothing but assemble a transcript[12] and that has no accreditation whatsoever. To allow such awards to stand would offend public policy by rewarding employees for nonexistent educational achievements.
 The union argues that the grievants were neither arrested nor censured for their conduct. In reviewing whether to vacate an arbitration award on public policy grounds, however, the court does not scrutinize the conduct of the individual, but the lawfulness of enforcing the award.