STATE OF MAINE
YORK, ss.
SUPERIOR COURT
Civil Action
Docket No. AP-15-0031

JON EAGLESON, *et al.*,

        Petitioners

    v.

TOWN OF KENNEBUNKPORT and
KENNEBUNKPORT CONSERVATION
TRUST,

        Respondents

**DECISION AND ORDER
GRANTING APPEAL**

Pursuant to M.R. Civ. P. 80B, petitioners Jon Eagleson; Susan E. Graesser; Susan Graham; Lora McGrath; C. Evan Stewart; Jenifer B. Stewart; Twenty Oak Street, LLC; Gretchen Warren; and Peter Warren ("Petitioners") appeal from a decision by the Kennebunkport Planning Board ("Board") approving the Kennebunkport Conservation Trust's ("Trust") application for approval to construct and operate a replica of a tide-powered grist mill on the Kennebunk River. For the reasons set out below, the appeal is granted and the Board's decision is vacated.

## I. Background

In 2006, the Trust acquired 1.68 acres of land located at 8 Mill Lane in Kennebunkport. (Rule 80B Administrative Record[1] 2, 26, 1281.) The property abuts the Mill Cove portion of the Kennebunk River and falls within three overlapping zoning districts identified by the Town of Kennebunkport's Land Use Ordinance ("Ordinance"): The Village Residential Zone ("VR Zone"); the Shoreland Zone ("SL

---

[1] Hereinafter cited as "R."

1

Zone"); and the Resource Protection Zone ("RP Zone"). (R. 1469-70, 1476.)

In years past, there was a grist mill on this site. The Perkins Grist Mill, powered by the river's tidal waters, was built in the early 1700s and operated for more than 200 years. In more recent years, after the Perkins Grist Mill had ceased operations, the building was converted into a restaurant—the Olde Grist Mill Restaurant. In the 1990s, a fire destroyed the restaurant and it was not rebuilt. (R. 217-18.) The only structure now existing on the property is a 2,440 square foot building known as the Clement Clark Boathouse ("the Boathouse"). The Boathouse was originally built and used as part of a boatyard. Subsequently it was used as an accessory structure to the Olde Grist Mill Restaurant. (R. 302, 925-26, 1416.)

The Trust has proposed to use the 8 Mill Lane property for a project known as the "River Heritage Education Center and Museum." Among other things, the project envisions using the Boathouse as a museum for preserving the heritage of the Kennebunk River and educating the public about the river's historical uses. The Trust has been using the Boathouse for several years to house artifacts and items of historical interest. (R. 419.) The project also envisions the construction of an 800 square foot, working replica of the Perkins Grist Mill as an adjunct to the museum. Like the original mill, the proposed replica would be powered by the ebb and flow of the tides. The Trust has obtained the necessary state and federal permits to utilize the river for this purpose. (R. 1-6, 56-102, 1418.)

In 2009, the Trust filed with the Board an application for site plan review to "construct a 35 foot ramp and 200 SF float for public access to the Kennebunk River," and to "install utilities to [the] Boathouse." (R. 788-89.) The cover letter accompanying the application further clarified that the utilities to be installed included public water, sewer, and electrical utilities. (R. 787-88.) Neither the cover letter nor

2

the application sought approval to use the Boathouse as a museum or for other educational purposes. *Id.*

The Board approved the Trust's application in January 2010 and issued a decision that set forth written findings and conclusions in accordance with applicable site plan review criteria in Article 10.10 of the Ordinance. (R. 301-07, 1586-88.) The findings and conclusions specifically addressed whether the proposed installation of utilities, a dock, and a boat ramp satisfied those criteria. The Board's approval stated as follows:

> The elements of the Application of the Kennebunkport Conservation Trust involving and relating to the dock and ramp as presented in the application, and to no other use, is APPROVED pursuant to Articles 10.10.A and 10.10.B, 10.11 and 10.12.E of the Kennebunkport Land Use Ordinance, provided that no more than four (4) parking spaces shall be provided for limited short-term parking for purposes of kayak and canoe loading and off-loading only, together with the activities of the Kennebunkport Conservation Trust; the installation of utility services for water, sewer and electricity at the site as depicted on the plans is likewise approved.

(R. 306.) No one appealed the January 2010 decision. On February 18, 2010, the State of Maine Department of Public Safety issued a construction permit authorizing alterations consistent with the decision of the Board. (R. 421.)

In September 2010, the Trust applied to the Town's code enforcement officer for a building permit to make the improvements the Board approved in January 2010. (R. 636.) The application requested a permit to "[i]nstall utilities (sewer, water, power) to the existing Boat House through separate underground trenches;" and it further stated: "The Boat House structure will be repaired and bathroom facility will be added." *Id.* The line entitled, "Proposed Use," was left blank. *Id.*

On September 10, 2010, the code enforcement officer issued a building permit certifying that the Trust "has permission to install sewer and water and power line.

3

And Repair or Rebuild Boathouse and add bathrooms as per plan and application."
(R. 422.) The building permit bore the following stamp: "Certificate of Use and Occupancy Required Before Furnishings are Moved In." *Id.* Subsequently, in December 2011, the code enforcement officer inscribed the date "DEC-6-11" on the line entitled, "Occupancy Final Inspection." (R. 423.) The issuance of the final approval was not appealed.

In 2013, and again in 2014, the Trust submitted to the Board an application for site plan review under Article 10 of the Ordinance. The application sought approval to construct a working replica of the Perkins Grist Mill as a "principal use" on the same Mill Cove property site. (R. 258, 268, 281, 284.) The Trust subsequently withdrew each of these applications.

In 2015, the Trust submitted another site plan review application seeking approval to construct the grist mill replica. The 2015 application sought approval of the grist mill, not as a principal use, but rather as "a structure accessory to a permitted use," namely the Boathouse museum. The Board held public hearings addressing the application on the evenings of June 3, June 17, July 22, and August 5, 2015; and convened for further deliberations on August 19 and September 16, 2015. (R. 131, 1412.)

The Board reviewed the Trust's application under Article 10.10 of the Ordinance, which sets out the criteria for approving or denying applications for site plan review. (R. 1586-87.) Pursuant to subsection (1)(a) of Article 10.10.A, the Board was required to make findings about whether the proposed use met all requirements of the Ordinance (and complied with applicable state and federal law). The Board approved the application, concluding that it satisfied all requirements of the Ordinance. Specifically, it found as follows: (1) The Boathouse "constitutes a lawful museum use"

4

under the Ordinance; (2) Under Article 4.15.B, which governs permitted uses in the Resource Protection Zone, the proposed grist mill constitutes a structure accessory to a permitted use (the Boathouse museum) in the underlying Village Resource Zone; (3) The proposed grist mill satisfies the definition of a "functionally water-dependent use" under the Ordinance; and (4) The proposed grist mill would not constitute an "industrial, commercial or manufacturing use" under the Ordinance. (R. 1414-18.)[2] The Board approved the Trust's application by a vote of four to one. (R. 1430.)

## II. Discussion

### A. Standard of Review

On a Rule 80B appeal, a local board's decision is reviewable for error of law, abuse of discretion, or findings unsupported by substantial evidence in the record. *York v. Town of Ogunquit*, 2001 ME 53, ¶ 6, 769 A.2d 172. Several principles guide the court's application of this standard of review.

First, the interpretation of a municipal ordinance presents a question of law subject to *de novo* review. *21 Seabran, LLC v. Town of Naples*, 2017 ME 3, ¶ 12, 153 A.3d 113; *Bizier v. Town of Turner*, 2011 ME 116, ¶ 12, 32 A.3d 1048; *Kurlanski v. Portland Yacht Club*, 2001 ME 147, ¶ 9, 782 A.2d 786.

Second, even though the interpretation of an ordinance presents *de novo* questions of law, a reviewing court owes deference to a municipal board's factual findings and characterizations in determining what satisfies an ordinance's definitions and standards. *Bizier*, 2011 ME 116, ¶ 8, 32 A.3d 1048 (substantial deference given to planning board's characterizations and findings of fact as to what meets ordinance

---

[2] The Board also found the proposed use satisfied the remaining criteria in Article 10.10.A(1)(b)-(p) and met additional health, safety, conservation, and other standards applicable under the Ordinance, Comprehensive Plan, and otherwise. (R. 1418-33.) None of these findings have been challenged on this appeal.

5

standards); *see also Jordan v. City of Ellsworth*, 2003 ME 82, ¶ 9, 828 A.2d 768 (substantial deference given to board's application of ordinance's definitions); *Goldman v. Lovell*, 592 A.2d 165, 168 (Me. 1991) (even though interpretation of ordinance presents question of law, determination of whether proposed structure or use meets ordinance definition involves factual findings for board's initial determination).

Third, with respect to determining whether findings are supported by substantial evidence in the record, "[i]f there is relevant evidence in the record to reasonably support the Board's conclusion, the fact that the record contains inconsistent evidence or inconsistent conclusions could be drawn from the evidence does not invalidate the Board's holding." *Tousst v. Town of Harpswell*, 1997 ME 189, ¶ 6, 698 A.2d 1063; *see also Gensheimer v. Town of Phippsburg*, 2005 ME 22, ¶¶ 16-17, 868 A.2d 161 (deference owed even if other conclusions could be drawn from the evidence).

B.  **Compliance with Ordinance Definitions and Requirements**

In approving the Trust's application, the Board considered the factors set forth in Article 10.10.A, including whether or not the proposed use satisfied the "specific requirements set forth in [the] Ordinance." (R. 1586.) Among the primary questions raised by the application were: (1) Whether the principal use at issue, the Boathouse museum, met the Ordinance's definition of "museum;" (2) Whether the proposed grist mill would constitute a "structure accessory" to that principal use; (3) Whether or not the proposed grist mill would constitute an "industrial, commercial or manufacturing use;" and (4) Whether the proposed use would constitute a "functionally water-dependent use." The Ordinance defines these specific terms. The Board determined on the basis of the record before it that the proposed use met each of the Ordinance requirements. Because there is sufficient support in the record, the court defers to the Board's determinations as follows.

6

### 1. "Museum"

The Ordinance defines a "museum" as:

A non-profit institution operated principally for the purpose of preserving and exhibiting objects of historical, cultural, scientific or artistic interest and which may also engage in incidental retail sales of items related to its principal purpose.

(R. 1457.)

Substantial record evidence supports the Board's determination that the current use of the Boathouse constitutes a "museum" under this definition. The Trust is a non-profit institution. The Trust has converted the Boathouse for use as a location to house and exhibit, among other things, objects, memorabilia, tools, photographs, and dioramas relating to the historical use of the river and the boatyard. The Boathouse is open to the public and hosts field trips and other visitors. (R. 547-49, 831-37, 1004-05, 1013-16, 1165, 1170.)

Although Petitioners have pointed to contrary or qualifying record evidence, in light of record evidence supporting the Board's finding, it does not compel a contrary result. *See Tousst*, 1997 ME 189, ¶ 6, 698 A.2d 1063. The Board's determination that the Boathouse meets the Ordinance's definition of museum is entitled to deference. *Bizier*, 2011 ME 116, ¶ 8, 32 A.3d 1048; *Lane Const. Corp. v. Town of Washington*, 2008 ME 45, ¶ 13, 942 A.2d 1202; *Jordan*, 2003 ME 82, ¶ 8, 828 A.2d 698.

### 2. "Accessory Structure"

The Ordinance defines an "accessory use or structure," in relevant part, as:

A subordinate use or structure customarily incidental to and located on the same lot as the principal use or structure, such as a detached garage, workshop or the like. Accessory uses, in the aggregate, shall not subordinate the principal use or structure on a lot.

(R. 1442.)

The Board determined that the proposed grist mill met this definition based on

7

several findings, and these findings have support in the record. The use would be subordinate and customarily incidental to the Boathouse museum. The museum is dedicated to preserving the heritage of the Kennebunk River, and is intended to serve as a facility to educate members of the public about that heritage. The Board found that the proposed grist mill, though a separate structure, would not be a separate program. It would be integrated into the museum's programs and displays, and would function as an adjunct to the museum, in the way that analogous structures were traditionally integrated into similar sites of historical importance. (R. 823, 1004-05, 1013-14, 1165, 1416.) The mill building would be built on the same lot as the Boathouse museum, and the building's footprint would be substantially smaller than that of the Boathouse building. (R. 1416.) Based on these and other findings, the Board concluded that the grist mill structure was subordinate and accessory to the Boathouse museum. (R. 1416-17.)

Petitioners argue that the Board failed to follow and apply the definition of "accessory use or structure" prescribed by the Law Court in *Town of Shapleigh v. Shikles*, 427 A.2d 460, 465 (1981). The Law Court did, in *dicta*,[3] discuss in *Town of Shapleigh* "the essence of an accessory use or structure" with reference to factors that may come into play in determining "whether a use or structure is accessory *within the terms of the a*

---

[3] The principal issue on appeal in *Town of Shapleigh* was whether the trial court had erred in denying the town's request for injunctive relief to tear down a guest cottage determined by the town to be a principal, not accessory, structure. The Court's holding was that "under the peculiar circumstances existing in this case, there was no abuse of discretion on the part of the presiding Justice in fashioning the equitable relief in the way that he did." *Id.* Ultimately the trial court (and the Law Court) deferred to the building inspector and board's prior interpretation of the ordinance's definition of principal (as opposed to accessory) building, and declined to entertain further the property owners' arguments regarding the accessory use because "they [property owners] have not exhausted an available administrative remedy wherein the factual question surrounding the claimed accessory use could be determined, the applicability of the ordinance's 'principal building' restriction to the facts could be decided, and their claim that the lot designated number 37 is immune from the stated limitation by reason of 'grandfather' status could be first ascertained." *Id.* at 466.

8

*zoning ordinance."* *Id.* (emphasis added). The Court concluded, however:

> Thus, it can be seen that the application to a particular situation of the concept of accessory use or structure as defined by the instant zoning ordinance may often present and depend upon questions of fact for initial administrative determination by the building inspectors and the zoning board of appeals officials, even though the meaning of the terms or expressions in zoning ordinances is a question of construction and one of law for the Court.

*Id.; see also Goldman v. Town of Lovell,* 592 A.2d 165, 168 (Me. 1991) ("Even though the terms of the zoning ordinance are . . . defined . . . as a matter of law, whether or not the proposed structure or use meets the definition in the application thereof may be a matter of fact for initial Board determination."); *Boivin v. Town of Sanford,* 588 A.2d 1197, 1200 (Me. 1991) (application of the definition of "accessory use" to a situation "may often present and depend upon questions of fact . . . even though the meaning of terms or expressions in zoning ordinances is a question of construction and one of law").

The Board's interpretation and application of the ordinance's definition of "accessory structure" is entitled to substantial deference, and the court does not find clear error. *See Bizier,* 2011 ME 116, ¶ 8, 32 A.3d 1048; *Lane Const. Corp.,* 2008 ME 45, ¶ 13, 942 A.2d 1202; *Jordan,* 2003 ME 82, ¶ 8, 828 A.2d 698.

### 3. "Industrial, Commercial or Manufacturing Use"

The Ordinance defines "use" as "[t]he *purpose for which land or a building* or structure is arranged, designed *or intended,* or for which it is occupied." (R. 1465.) (emphasis added). The Ordinance defines "commercial use" as "[t]he use of lands, buildings, or structures, other than a 'home occupation,' . . . with the intent and result of which activity is the production of income from the buying and selling of goods and/or services, exclusive of rental of residential buildings and/or dwelling units." (R. 1446.) The Ordinance defines "industrial" as the "assembling, fabrication, finishing, manufacturing, packaging or processing of goods, or the extraction of minerals;" and

9

"manufacturing" as the "making of goods and articles by hand or machinery including assembly, fabrication, finishing, packaging and processing. (R. 1453, 1455.)

The Board determined that "the primary purpose of the Grist Mill is not to produce or manufacture flour for commercial sales; rather, production of flour is incidental to the primary demonstrative operation of the historic tidal grist mill operation that is an important accessory component of the overall museum use of the site." (R. 1418.) There is sufficient record evidence to support the Board's determination that the Trust did not intend the proposed grist mill to be an industrial, commercial enterprise, or to use it for the purpose of making goods and articles. Rather, it was intended to serve as an operating facsimile of the historic Perkins Grist Mill in conjunction with the river heritage museum housed in the Boathouse, principally for demonstrative and educational purposes. The Board could have reasonably determined that the fact the grist mill would produce flour did not transform it into an industrial, commercial, or manufacturing use as those terms are intended in the Ordinance. (See R. 2-6, 38-39, 325-28, 824.) A board's factual findings that characterize a use will not be disturbed unless unsupported by record evidence. *Jordan*, 2003 ME 82, ¶ 8, 828 A.2d 768; *see also Rudolph v. Golick*, 2010 ME 106, ¶ 15, 8 A.3d 684 (concluding that the fact that a particular use would produce income does not compel the board to find the use is "commercial"). The incidental sale of goods related to a museum use is specifically contemplated and allowed under the ordinance.

### 4. "Functionally Water-Dependent Use"

Since the proposed grist mill would be located on the bank of the Kennebunk River, in the RP Zone, the Trust also was required to establish that the proposed use

10

met the definition of a "functionally water-dependent use"[4] as set forth in Article 2.2 of the Ordinance in order to be exempt from the applicable setback requirement in Article 4.17. (See R. 1452, 1498.) The Board found that the proposed grist mill met this definition, and Petitioners do not challenge this finding.

## C. "Permitted Uses" in the Resource Protection Zone under Article 4.15.B(3)[5]

The Planning Board further concluded that, pursuant to Article 4.15.B(3), the proposed grist mill—as an accessory structure to the Boathouse museum—was an authorized use permitted in the RP Zone. (R. 1496.) Article 4.15.B(3) allows in the RP Zone "[s]tructures accessory to permitted uses, but not the accompanying principal structures." (*Id.*) The Board construed Article 4.15.B(3)'s reference to "permitted uses" to mean "permitted uses *in the underlying zone*," and then further reasoned that since the underlying zone in this case, the VR Zone, "allows a museum as a conditional use," and since the Boathouse museum had "received all necessary permits and approvals," then the Boathouse museum was a "lawful" permitted use that could serve as a principal use to the proposed accessory structure, the grist mill. (R. 1415-16.) Petitioners challenge both the Board's interpretation of "permitted uses" in Article 4.15.B(3) and its application to the record facts in this case.[6]

---

[4] The Ordinance defines "functionally water-dependent uses" in relevant part as "[t]hose uses that require, for their primary purpose, location on submerged lands or that require access to, or location in, coastal or inland waters and that cannot be located away from these waters." (R. 1452.)

[5] The site of the Boathouse and proposed grist mill falls within three overlapping zones—the VR Zone, the SL Zone and the RP Zone—with the RP Zone being the most restrictive. Article 1.5 provides that "whenever a provision of this Ordinance [dealing with, among other things, use of land] conflicts with, or is inconsistent with another provision of this ordinance, or other town ordinances . . . the more restrictive provision shall control." (R. 1441.) The proposed use, therefore, had to qualify as a use permitted in the RP Zone under Article 4.15. (R. 1496.)

[6] Petitioners also argue that the Board erred in approving the grist mill as a lawful accessory structure in the RP Zone under Article 4.15.B(3) based upon another, independent ground.

11

### 1. Scope of "Permitted Uses" in Article 4.15.B(3)

Petitioners contend the Board erred because the reference in Article 4.15.B(3) to "permitted uses" must be read more narrowly to include only the uses expressly permitted in the RP Zone itself. The Town and the Trust contend that the Board's construction of Article 4.15.B(3) is a practical one and is consistent with the Ordinance's language and overall intent.

This issue presents a question of law for *de novo* review. *See 21 Seabran, LLC,* 2017 ME 3, ¶ 12, 153 A.3 113; *Isis Dev., LLC v. Town of Wells,* 2003 ME 149, ¶ 3, 836 A.2d 1285. The court looks to the Ordinance's plain language as well as its general structure and overall objectives in order to ascertain the meaning of Article 4.15.B(3) and effectuate the intent of the drafters. *Wister v. Town of Mount Desert,* 2009 ME 66, ¶ 17, 974 A.2d 903; *Isis Dev., LLC,* 2003 ME 149, ¶ 3; *Jordan,* 2003 ME 82, ¶ 9, 828 A.2d 768; *Gerald v. Town of York,* 589 A.2d 1272, 1274 (Me. 1991).

The term "permitted use" itself is not a defined term in Article 2.2 or elsewhere. The Ordinance consistently employs the precise, two-word term, "permitted uses," with reference to activities and land uses that are expressly identified and listed as permitted uses in the land use tables or otherwise in each applicable zoning district.[7]

---

The proposed accessory structure—the grist mill—and its associated principal structure—the Boathouse—would both be located within the RP zone. Article 4.15.B(3) authorizes in the RP Zone "[s]tructures accessory to permitted uses, *but not the accompanying principal structures.*" (emphasis added.) Petitioners contend that the final clause—"but not the accompanying principal structures"—means that the accessory structure and the principal structure both cannot be physically located in the RP Zone. Since the appeal is resolved on other grounds, the court does not address this argument.

[7] See Articles 4.2 ("Any land use which is not *listed as a permitted use* or a conditional use shall be prohibited."); 4.3 (Listing the *"Permitted Uses"* in Village Residential Zone land use table); 4.4 (Listing the *"Permitted Uses"* in Village Residential East Zone land use table); 4.5 (Listing the *"Permitted Uses"* in Dock Square Zone land use table); 4.6 (Listing the *"Permitted Uses"* in Riverfront Zone land use table); 4.7 (Listing the *"Permitted Uses"* in Cape Arundel Zone land use table); 4.8 (Listing the *"Permitted Uses"* in Goose Rocks Zone land use table); 4.9 (Listing the *"Permitted Uses"* in Cape Porpoise Zone land use table"); 4.10 (Listing the *"Permitted Uses"* in

The Ordinance employs the same two words differently—in reverse order or with another word—when referring more generally to uses that are permissible under provisions in the Ordinance, either as permitted uses or conditional uses.[8] The plain meaning and usage of these words demonstrate that the drafters of the Ordinance intended the precise phrase, "permitted uses", to be a specific reference to the uses listed in the land use tables or otherwise expressly prescribed for each zone rather than the general reference. At the very least, the Board's interpretation of the phrase, which effectively grafts onto "permitted use" the additional phrase, "in the underlying zone," is inconsistent with Article 4.15.B(3)'s plain language.

The inconsistency is more pronounced when viewed in light of other Ordinance provisions. For example, the introductory language to Article 4.14, which sets out the SL Zone use table, states: "In those portions of the Shoreland Zone which are *not* within the Resource Protection Zone only those uses permitted *in the underlying zone* shall be permitted." (R. 1495.) (emphasis added.) And, Article 4.14.B(6) recognizes that "[a]ny commercial, industrial, governmental or institutional use permitted *in the underlying zone*" may be a permitted use in the SL Zone as well with Board approval. *Id.* (emphasis added). The Ordinance drafters understood how to insert a qualifying clause to incorporate the uses permitted in an underlying zone, and they did not do so in Article 4.15.B(3). Therefore, the court finds that the drafters did not intend all uses that may be permissible in the underlying zones to be "permitted uses" in the RP Zone.

---

Cape Porpoise Square Zone land use table); 4.11 (Listing the *"Permitted Uses"* in Free Enterprise Zone land use table); 4.12 (Listing the *"Permitted Uses"* in Farm and Forest Zone land use table); 4.18 (Listing the *"Permitted Uses"* in Goat Island Light Contract Zone land use table); (R. 1478, 1480-81, 1483, 1485, 1486-88, 1490, 1492, 1501.) (emphasis added).

[8] See, e.g., Article 4.1 (*"Permitted land uses* in all zones shall conform to all applicable standards and requirements."); Article 4.2 ("The *land uses permitted* in each zone are listed below.") (R. 1478.) (emphasis added.)

*See Oakland Mfg. Co. v. Lemieux*, 98 Me. 488, 490, 57 A. 795, 796 (1904) ("It is fair to presume that if the legislature had intended such a result it would have expressed that intention in unmistakable terms.")

This difference in language highlights a more fundamental point. Article 4.14, in express terms, broadens the scope of potential uses permitted in the SL Zone to include those uses allowed in the underlying zone—*except* where the RP Zone also overlays and covers the same site. Thus, in zones where both the SL Zone and the RP Zone lay over an underlying zone, the uses in the underlying zone are not included and therefore are not allowed unless they also satisfy the requirements of Article 4.15. Construing "permitted uses" in Article 4.15.B(3) to include uses "in the underlying zone" conflicts with the plain language of Article 4.14, and results in a potential application that could be not only inconsistent, but also illogical. *See Desfosses v. City of Saco*, 2015 ME 151, ¶ 8, 128 A.3d 648 (ordinances must be interpreted "in light of the entire [ordinance] scheme to achieve a harmonious result," and avoid interpretations that result in inconsistent, "absurd or illogical results").

A more expansive interpretation that allows all uses permissible in an underlying zone as principal uses in the RP Zone under Article 4.15.B(3) is also inconsistent with the purposes of the RP Zone, which sets more restrictive standards to enhance protection of areas proximate to sensitive natural resources.[9] And, it would conflict with the Ordinance's requirement that "whenever a provision of this Ordinance [dealing with, among other things, use of land] conflicts with, or is inconsistent with

---

[9] *E.g.*, Article 5.1 (identifying purposes of RP Zone and SL Zone to "further the maintenance of safe and healthful conditions and general welfare; prevent and control water pollution; protect spawning grounds, fish, aquatic life, bird and other wildlife habitat; control building sites, placement of structures and land uses; and conserve shore cover, visual as well as actual points of access to inland and costal waters and natural beauty.") (R. 1505.); Article 4.17.A (general setback requirement of 250 feet in RP Zone.) (R. 1498.)

14

another provision of this ordinance, or other town ordinances . . . the more restrictive provision shall control."   (R. 1441.); *see also Logan v. City of Biddeford,* 2006 ME 102, ¶ 14, 905 A.2d 293 (where two potentially applicable zoning standards applied, but one would result in approval and the other denial, there was a conflict and thus the more restrictive provision applied when there was a provision in the ordinance that so required).

The Trust argues that limiting the term "permitted uses" in Article 4.15.B(3) to include only uses allowed in the RP Zone would be inconsistent with the Ordinance's more general use of the term "permitted" in other sections, such as Article 4.1. However, as noted above, the Ordinance does not employ the precise term "permitted uses" in Article 4.1 or other sections where a more general reference appears intended.

The Trust's citation of *Gerald v. York* to support a broader interpretation of "permitted uses" in this context is not persuasive.   589 A.2d 1272 (Me. 1991).   In that case, the Law Court held that the trial court erred in limiting the term "permitted uses" to those uses expressly listed as such in the zoning ordinance to the exclusion of other, nonconforming uses that had previously been allowed in the same zone. *Id.*   The Trust recognizes that the instant case does not involve a contention that use of the Boathouse as a museum is a grandfathered nonconforming use, and the court does not address that specific issue.   Moreover, *Gerald* involved the interpretation of a different ordinance altogether; and when subsequently addressing the same issue involving an ordinance more closely resembling this Ordinance, the Law Court reached a result contrary to *Gerald*.   *See Gensheimer,* 2005 ME 22, ¶¶ 16-18, 868 A.2d 161.

Likewise, the Town, citing *Fitanides v. City of Saco,* contends that limiting the scope of permitted principal uses in Article 4.15.B(3) to those uses listed in Article 4.15 is not only inconsistent with the plain language of subsection 3 but also renders the

15

overlay nature of the RP Zone meaningless. 2015 ME 32, ¶ 17, 113 A.3d 1088. The court has already addressed the former contention, and concluded it is the Board's construction of "permitted uses" in Article 4.15.B(3) that conflicts with the Ordinance's plain language and overall usage of the term. Contrary to the Town's other contention, as noted above, it is not illogical to construe the requirements of the RP Zone more strictly than that of the underlying VR Zone. Finally, the Town's reliance on *Fitanides* is misplaced. *Fitanides* held that where an overlay zone does not apply until a condition precedent occurs it would be illogical to apply the requirements of the overlay zone before the condition occurs. *See id.* ¶¶ 17-18. There is no dispute in this case that the RP Zone applies and overlays the location of the proposed use.

Therefore, the court concludes that the Board erred in construing the term "permitted uses" in Article 4.15.B(3) as if it read, "permitted uses in the underlying zone." However, even if the Board's construction were accepted, the record does not support the conclusion that the Boathouse museum was a permitted use within the meaning of Article 4.15.B(3) because it was not an approved conditional use in the VR Zone.

### 2. Status of Boathouse Museum as "Permitted Use" under Article 4.15.B(3)

A museum is allowed as a conditional use in the VR Residential Zone, as the Board correctly noted. (R. 1478.) "Museum" is listed as a conditional use in Article 4.3's land use table; however, it is listed as a conditional use "subject to site plan review." (*Id.*) Thus, while a museum may be a permissible use in the VR Zone, Article 4.3 requires that the Planning Board approve such use through the site plan review process. (R. 1478, 1576.) Here, the Board concluded that the Trust "has received all necessary permits and approvals to use and occupy the Boathouse Building in the manner [that the Trust] has occupied it since its final inspection and occupancy

16

permit issued by the Code Enforcement Officer on December 6, 2011 – as a museum."
(R. 1416)   The record does not support this conclusion.   The Trust has never applied
for site plan review of the proposed museum use of the Boathouse; nor has the Board
approved such a conditional use.

First, the Trust's instant 2015 application did not seek approval for conditional
use of the Boathouse as a museum, nor did the Board's approval in this case treat the
application as so requesting.   (R. 1-15, 1411-30.)

Second, the "necessary permits and approvals" referenced in the Board's
decision did not constitute prior planning board review and approval of the Boathouse
as a museum in the VR Zone under Article 4.3.   In 2009, the Trust submitted a site plan
application to "construct a 35 foot ramp with associated 200 SF dock for public access"
and to "install utilities to boat house"[10] with reference to a cover letter "for additional
information."   (R. 790.)   The cover letter to the application stated that the Trust was
applying "for approval to construct a new public dock on the Kennebunk River on
property located at 8 Mill Lane, the site of the former Grist Mill;" and that, "public
water, sewer, and electrical utilities will be installed to the existing boathouse."   (R.
787.)   Further, "[t]he site is currently available for use to the public to access the river
and to enjoy the view."   *Id.*   The proposed dock, ramp, and float systems were
"designed to provide safer access for boaters during all tide conditions."   (R. 787.)
The application did not mention any use of the Boathouse as a museum.   Where the

---

[10]   The 2009 application for site plan review, in both the cover letter and the application itself,
described the 8 Mill Lane site as being located in the *Dock Square* zoning district, *not* the VR
Zone (and also in the SL Zone and RP Zone).   (R. 787, 789.)   Under the current Ordinance, a
museum is not listed as either a permitted use or conditional use in the Dock Square zoning
district.   (R. 1481.)   It is unclear whether the Trust's 2009 application identified the correct
zone at the time, whether the application was subsequently amended, or whether the Ordinance
has since been amended to change the boundaries of the Dock Square and Village Residential
zoning districts as pertains to this site.

17

application form provided a line to indicate "Existing use of Property," the application states, "PUBLIC"; and for "Proposed use of Property," the application states, "PUBLIC." (R. 789.)

The Board's January 2010 decision approving the Trust's 2009 application contained only findings addressing whether the proposed installation of utilities, a dock and a boat ramp satisfied the site plan review criteria in Article 10.10.A. (R. 301-07, 1586-88.) The 2010 decision did not mention, let alone approve, use of the Boathouse as a museum. In fact, the intent and scope of the Board's approval was clear:

> The elements of the application of the Kennebunkport Conservation Trust involving and relating to the dock and ramp as presented in the application, *and to no other use,* is APPROVED pursuant to Articles 10.10.A and 10.10.B, 10.11 and 10.12.E of the Kennebunkport Land Use Ordinance . . . [and] . . . the installation of the utility services for water, sewer and electricity is likewise approved."[11]

(R.306.) (emphasis added).

In light of the approval granted by the Board, the September 2010 building

---

[11] The Board's decision noted that there had been "some discussion" at a December 2009 meeting in connection with the Trust's 2009 application about "whether the principal use of the site should be considered a Museum, a Community Use, or a Park," or "the existing Boathouse might meet the definition of either a Museum or Community Building." (R. 1415.) This does not convert the Board's 2010 decision into an approval of the Boathouse museum as a conditional use. The Ordinance requires site plan review approvals to be in writing and to set forth the supporting findings and conclusions. Article 10.8(G), for example, specifies that the Board "shall reach a decision and inform, in writing, the applicant and the Code Enforcement Officer of its decision and its reasons therefor." (R. 1585.) Article 10.10(C) states: "All decisions of the Planning Board under this Article shall be accompanied by written statements that set forth with particularity the precise reasons why the findings were made." (R. 1588.) Moreover, the January 2010 approval of four parking spaces "for limited short-term parking for purposes of kayak and canoe loading and off-loading only, together with the activities of the Kennebunkport Conservation" made no mention of the museum-related standard for floor square footage that the Board cited as further evidence that it had approved a museum use in 2010. (*See* R. 306, 1415.) Even if the Board had determined the number of parking spaces permitted based on that formula in the context of the 2009 application, and the phrase, "together with the activities of the Kennebunkport Conservation Trust" was intended to encompass other "activities" including potential use as a museum, this does not satisfy the Ordinance's requirements for specificity and is not a basis for finding a previous conditional use approval of the Boathouse as a museum.

18

permit issued by the code enforcement officer to install the utilities and rest rooms "as per plan and application" approved in January cannot independently constitute a conditional use permit to use the Boathouse as a museum. Nor does the December 2011 stamp by the code enforcement officer indicating: "Occupancy Final Inspection."

The court is mindful that, as the Trust points out, the "regularity of administrative action is presumed" and this principle applies to decisions of municipal boards that may not have recorded every finding and conclusion in the administrative record. *Driscoll v. Gheewalla,* 441 A.2d 1023, 1029 (Me. 1982). *Driscoll,* however, is distinguishable. The case involved a failure by the zoning board of appeals to make an express hardship finding in granting a variance from setback requirements. Even without the finding, however, it was obvious from the record that without a variance the lot would be patently unbuildable, and therefore a hardship. Here, the record is also clear, and it does not support the Board's conclusions about the intent and effect of its prior actions. Moreover, the Court in *Driscoll* also cautioned municipal boards: "Despite this presumption, zoning boards of appeals should take pains to frame their legal conclusions in language commensurate with that of the statutes they enforce and to specify in their decisions the facts upon which they base such conclusions." *Id.* 1029-30 fn. 5. Had it been the Board's intention to grant conditional use approval to the Trust in 2010 to operate the Boathouse as a museum, its decision would have—and should have—followed Ordinance requirements, framed its legal conclusions accordingly, and specified the facts supporting those conclusions.

The Board erred in concluding that the Boathouse museum was approved as a

19

conditional use and therefore was a "permitted use" under Article 4.15.B(3).[12]

## D. Timeliness, Reviewability, and Vested Rights

The Town and Trust argue that Petitioners' challenge to the Board's finding that the Boathouse museum is an appropriate, lawful principal use is time-barred because they are attempting to review municipal decisions made in 2010 and 2011, which were not appealed at the time and where the deadline to appeal has passed. The court finds their arguments unpersuasive.

The Trust relies on *Juliano v. Town of Poland* to argue that Petitioners may not seek review of whether the Boathouse museum use has been lawfully allowed, even if the Town's action or inaction was legal error. 1999 ME 42, 725 A.2d 545. *Juliano* does not support that contention. In that case, a municipal zoning board upheld a stop work order issued by the new code enforcement officer on the ground that the building permit issued two years prior was invalid (and ongoing construction thereunder should be halted) because the construction had not been approved as a conditional use. The Law Court considered the stop work order to be, in essence, an "appeal" of the prior building permit; and held that under the ordinance the appeal was untimely, and that compliance with the ordinance's appeal procedures was necessary "to ensure that once an individual obtains a building permit, he can rely on that permit with confidence that it will not be revoked after he has commenced construction." *Id.*, ¶ 7 (quoting *Wright v. Town of Kennebunkport*, 1988 ME 184, ¶ 8, 715 A.2d 162). Petitioners do not challenge

---

[12] The Trust contends that there is an alternate basis under Article 4.15 to approve the grist mill as an activity or use allowed in the RP Zone, citing Article 4.15.B(10), which expressly permits a "use similar to uses requiring approval from the Planning Board." (Def. Trust's Br. at 41. The Trust argues that the "similar use" is a "nonresidential educational facility" which is also expressly allowed under Article 4.15.B(4). It does not appear that this argument was presented to or considered by the Board. Because the Board did not consider that issue, the court declines to do so for the first time on appeal.

the permits issued in 2010 and 2011 (or the work done or use made pursuant thereto). Nor have they failed to comply with the Ordinance's appeal procedures. As noted above, the Trust's 2009 application for site plan review did not request, and the Board's 2010 approval did not grant, a conditional use permit to use the Boathouse as a museum. There was no conditional use approval in 2010 to appeal.

The Town cites *Edwards v. Blackman* in support of its argument that Petitioners' appeal is time-barred. 2015 ME 165, 129 A.3d 971. *Edwards* involved a declaratory judgment action seeking to invalidate a municipal vote accepting dedication of a road. *Id.* ¶ 21. Even when applied in this Rule 80B context, *Edwards* is inapposite because in that case the town had clearly voted to accept the dedication of a road whereas here there was no prior decision approving a conditional museum use for the Boathouse that would have triggered appellate review.

Therefore, a challenge to the Board's decision in this case, which involves—and hinges upon—a question of whether the Boathouse museum is a permitted principal use under Article 4.15.B(3) as a predicate for approving the grist mill as an accessory structure, is not untimely and is reviewable in this appeal.

In a similar vein, the Trust has not acquired the type of recognized "vested rights" to use the Boathouse as a museum that precludes review. This case does not involve an instance where construction was underway when an ordinance was amended or the Town's interpretation shifted. *See Sahl v. Town of York*, 2000 ME 180, ¶¶ 12-13, 760 A.2d 266 (vested rights based on good faith commencement of significant construction pursuant to validly issued building permit subsequently affected by change in ordinance); *see also* Ordinance Article 8.9; *Thomas v. Zoning Bd. of Appeals*, 381 A.2d 643, 647 (Me. 1978) Moreover, as discussed, the Trust cannot now rely on the 2010 approval and subsequent permits issued pursuant thereto as conferring rights that

21

were not granted in the first place.

Finally, the Town contends that Petitioners may not challenge the Board's failure to issue a conditional use permit for the Trust's use of the Boathouse as a museum because Petitioners cannot compel enforcement of the zoning laws when the Town has declined to act. It does not appear, however, that Petitioners are challenging the museum use as unlawful. Rather, they contend the grist mill site plan application should have been denied because the museum is not a "permitted use" under Article 4.15.B(3). The Trust may or may not have some vested rights or equitable basis to estop the Town from issuing a cease and desist order regarding the museum use. That is a separate question which does not impact the issue at hand, namely whether the museum use of the Boathouse satisfies the definition of a "permitted use" under Article 4.15.B(3) such that the Board lawfully approved the grist mill as an accessory structure thereunder.

### III.   Conclusion and Order

Accordingly, the court concludes that the Boathouse museum is not a "permitted use" within the meaning of Article 4.15.B(3) and therefore the Board's approval of the grist mill as an accessory structure to the Boathouse was legal error. The Board's decision will be vacated and the matter remanded to deny the application.

The entry shall be:

> Petitioners' Rule 80B appeal is GRANTED. Decision of the Kennebunkport Planning Board is REVERSED, and the Trust's application is DENIED.

**SO ORDERED.**

DATE:   April 7, 2017

Wayne R. Douglas
Justice, Superior Court

22